[No. 1457.]

## WILLIAM POWELL v. THE STATE.

1. MURDER—EVIDENCE.—As tending to establish a motive for the killing, it was competent for the State to prove, in a murder trial, that the defendant had served a term in the penitentiary for the burglary of the house of the deceased.

2. PRACTICE—SEQUESTRATION OF WITNESSES.—The enforcement of the rule for sequestering witnesses is a matter largely confided to the discretion of the trial judge, and his action will not be revised in the absence of the showing of an abuse of that discretion. The exemption from the rule of a witness who was an attorney of court, and one of the prosecuting counsel in the case, is not an abuse of discretion.

3. MURDER IN THE SECOND DEGREE—CHARGE OF THE COURT.—When, in a trial for murder, the evidence adduced tends to establish murder of the second degree, it is proper for the court to give in charge the law of murder in that degree. See this case for evidence which is held to authorize a charge upon murder of the second degree.

4. SAME—ALIBI—CHARGE UPON THE WEIGHT OF EVIDENCE.—When, as in this case, it appears that the defense under the plea of "not guilty" relied upon the establishment of an *alibi*, it was not improper for the court to state in its charge to the jury that *alibi* was the defense relied upon, and such charge was not a charge upon the weight of evidence.

5. SAME—EVIDENCE—PROOF OF THE CORPUS DELICTI.—It is an ancient and well settled principle of the law of homicide that, if a wound causes a disease which produces death, the death is imputable to the wound. Medical testimony that the wound inflicted caused the death, and that one or various diseases combined to produce that result, but that they were produced by the wound, is evidence sufficient to establish the *corpus delicti.*

6. SAME.—Where death ensues from a wound given in malice, but not in its nature mortal, but which being neglected or mismanaged, the party died therefrom, this will not excuse the party inflicting it; but he will be held guilty of the murder, unless he can make it clearly appear that the maltreatment of the wound, or the medicine administered to the patient, or his own misconduct, and not the wound itself, was the sole cause of death. So, if the deceased were ill of a disease apparently mortal, and his death was hastened by injuries maliciously inflicted by the accused, this proof will support an indictment for murder; for an offender shall not apportion his own wrong.

7. SAME—EVIDENCE.—The opinion of medical experts as to the cause of the death is always admissible when such cause is involved in doubt, and there was no witness to the occurrence.

Appeal from the District Court of Harrison. Tried below before the Hon. A. J. Booty.

The indictment charged the appellant with the murder of Mack Allen, on the fifteenth day of February, 1882. He was found guilty of murder in the second degree, and the jury imposed upon him, as penalty, a term of fifty-two years in the penitentiary.

Doctor J. H. Taylor, a graduate of the Bellevue Medical College, New York, and a physician of eleven years experience, testified, for the State, that on the night of the fifteenth of February, 1882, he was called to attend the deceased. He found him suffering from a wound in the left leg, behind the knee joint, which was inflicted by a pistol ball. The flow of blood had then been stopped by a clot. The witness made an examination of the wound that night, and remained with the patient as long as he thought necessary.

The next morning the witness returned with Doctor Eads, a physician and surgeon, and they made an examination of the wound, probing for the ball, without finding it. The patient was a large, fat man, which rendered the course of the ball more difficult to trace. Neither of these physicians at that time saw reason to anticipate the necessity of amputation, and they put him under a course of treatment suggested by their best judgment. The witness attended the deceased regularly, and he was well nursed. He appeared to be doing very well until the lapse of about ten days, when the witness discovered that the toes on the foot of the left or wounded leg were cold, and that a portion of the leg below the wound was affected with gangrene, rendering amputation necessary. The witness again took Doctor Eads with him, and his judgment coinciding with that of the witness as to the necessity of amputation, the witness took the leg off at a point some two or three inches above the knee joint. At this time the wound made by the ball had about healed. After the amputation of the leg, hopes of the ultimate recovery of the deceased were entertained until a short time before his death, which took place on the nineteenth day of March, 1882.

After the amputation of his leg the deceased had two attacks of colic, and was constantly troubled with diarrhœa. These attacks of colic, and the diarrhœa, tended to weaken him. The day before he died, his abdomen swelled up, making the skin very tight, and he complained of intense pain in his bowels.

This diarrhœa, followed by this swelling of the bowels, the physicians attributed to an abscess formed in the bowels.

Allen died from the wound, diarrhœa, the swelling of and pain in his bowels, and the abscess, if any there was, in the bowels, all combined; but the wound caused all of these disorders.

Cross-examined, the witness testified that, from the nature of the wound, the person who fired the shot must have stood behind the deceased. On the first visit, Docto Eads did not think amputation necessary. The witness tho· t it possible that a particular artery or nerve, one or both ch lie near, and about one-eighth of an inch beneath th at the point entered, might be injured, but the impossil tracing the course, or finding the place of lodgment of t. left the witness and Doctor Eads in uncertainty as to th of the wound upon this artery or nerve. Generally, whe. · this artery or nerve is severed, amputation is necessary. ·t mortem examination of the body was made, and it is po. hat no abscess had been formed in the bowels. It was the. still continued to be, the judgment of the witness that an al had formed in the bowels. He was of opinion, too, that b. ·oison set in. In the opinion of the witness, the treatment ι ich the deceased was subjected was proper, and amputatioı the time it was performed, was an absolute necessity. TL itness used the knife in the operation, but was assisted by Doι · Eads.

After taking off the leg, the ball was found a. əply imbedded in the femor or thigh bone, entering from the rear. The artery was then found to have been cut by the ball, the nerve nearly severed, and the vein injured. The witness gave the ball taken from the leg to sheriff Perry.

Doctor B. F. Eads, a graduate in medicine and surgery from the University of Pennsylvania, and with extensive practice, next testified for the State. His testimony was corroborative of that of Doctor Taylor in its entirety. The treatment deceased was subjected to by Doctor Taylor the witness believed to be eminently proper. His nursing was all that could be desired. The operation in the amputation of the leg, performed by Doctor Taylor, was skillful. The witness believed then, and still believed, that an abscess was formed in the bowels by blood poisoning, resulting from the wound. The wound was the cause of his death, and it superindued the other disorders, as named by Doctor Taylor.

The State next called D. Welch to the stand, and having laid

the proper predicate, introduced through him the dying statement of Allen, the deceased, made about two hours before death. It was as follows:

"I was going home, about twelve o'clock at night. I got as far as Dan Heyn's southwest corner on my way home, and just as I passed that corner I met Willie Powell, and Powell passed me a step or two, and then turned and shot me, inflicting the wound in my left leg from which I am now confined. I closed my house about twelve o'clock, took my lighted lantern and started home, and by the light of the lantern I recognized Willie Powell. At that time I said to Powell, 'I know you,' and Willie Powell ran off towards town."

Cross-examined, this witness, Welch, said that he was the partner in business of the deceased at the time the latter was shot. The witness had never read the statute about dying declarations, had never heard it read, and had talked to no one about the dying declarations of the deceased. There were present when the deceased made this statement, the witness, Rob. Ray and Mrs. Allen, the wife of the deceased. The witness, Rob. Ray and Mrs. Allen thought that deceased would recover, until the day before his death, but the deceased said all the time that he would die. The witness had no ill feeling towards the defendant.

Sheriff Perry testified, for the State, that on the night of the shooting of the deceased, having been informed of that fact at about twelve o'clock, he went to the jail and got Mr. Long and Mr. Rudd, and went to the house of Maria Powell, in the city of Marshall. He knocked at the door twice before being answered; he demanded admission, and was requested by Maria Powell to wait until she could get her clothes on. After some time she opened the door and asked the witness what he wanted. He answered, "I want Willie Powell." He found the defendant in bed with his pants and socks on. The defendant asked, "What do you want with me?" and the witness replied, "You are charged with shooting Mr. Allen." The witness found a five shooting pistol under defendant's pillow, one barrel of which appeared to have been recently discharged. The defendant was arrested and jailed. The witness here produced a pistol ball which he said was given him by Doctor Taylor. It had the appearance of having been shot, and fitted, with precision, the pistol taken from the defendant's bed.

Deputy sheriff B. W. Long, who was with the sheriff when

the arrest of the defendant was made, corroborated the witness Perry in every particular.

John Gregg testified, for the State, that on the night of the shooting he, his brother and Jim Wilson were going home from Sterling Wood's house, where they had been practicing on some musical instruments, and between twelve and one o'clock they heard a shot in the direction of Dan Heyn's corner. In about ten or fifteen minutes the defendant came up to them and was asked if he knew who fired that shot, and he said "Yes, I did." He then took out his pistol and said: "Let me see if I fired the right ball." He examined his pistol by the light of the witness's lantern, and said: "Yes, I fired the right one, number thirty-two." He then offered the party a chew of tobacco, which being declined, they separated, the witness and party going home and the defendant in a direction from his home.

James Gregg testified exactly as his brother did.

Mrs. Maggie Allen, the widow of the deceased, qualified herself under the statute to testify as to the dying declarations of the deceased, and stated that the day before the deceased died he made the following statement to her:

"I left my saloon, first closing it, on the night I came home shot, some time past twelve o'clock, and walked in the direction of home until I reached the Dan Heyn corner. There I met Willie Powell, whom I recognized by the light of my lantern. He passed me a step or two, and then shot me. I turned around and fell, or partly fell, and saw him run off towards town. I said to him: 'You scoundrel, you have shot me, but I know you.'" This witness also declared that the nursing and treatment of the deceased was according to Doctor Taylor's directions, and that he was well cared for. The witness had, she said, talked to no one about the case, except the counsel for the State. She had never read, nor heard read, the statute in regard to dying declarations.

Tobe Wallace, for the State, testified that he and another colored man were in Allen's saloon playing billiards on the night of February 15, 1882, before the shooting occurred. At about five minutes past twelve, Allen told the witness and his companion that he wanted to close up. About this time, the defendant came in at the back door of the saloon and asked Allen for some dice. Allen refused to let him have the dice, and the defendant said, "By God, that's all right," and went out at the back door   The defendant was in Allen's saloon once before on that night, about

ten o'clock. The back door of Allen's saloon led into a yard, which adjoined the house in which the defendant and his mother lived. The fence was in bad condition, and one could pass to and fro with no inconvenience.

Gilbert Kendall testified, for the State, that on the day before the shooting he heard the defendant and his wife, Julia, quarreling on the sidewalk, during which quarrel the defendant said that he would give the next man who sold whisky to his wife a number thirty-two cartridge. The witness did not know what the defendant and his wife were quarreling about, nor did he hear the defendant mention anybody's name.

Ben Davis testified, for the State, that he heard the defendant say that Mack Allen had been selling whisky to his wife, Julia, and that, if he did not quit doing so, he, the defendant, would burst a number thirty-two cartridge in his ear.

The prosecution, over the objection of the defendant, then introduced in evidence an indictment returned into the District Court of Harrison county by the grand jury, on the fourteenth day of May, 1879, charging the defendant with the burglary of the storehouse of the defendant and D. Welch; also, the judgment of the district court, reciting the verdict of the jury, finding the defendant guilty of the burglary charged, and assessing his punishment at confinement for two years in the penitentiary, and the final judgment and sentence of the court in the aforesaid conviction for burglary. This evidence is involved in one of the rulings of this court, and held competent as tending to establish a motive for the shooting.

Alex. Pope, an attorney of the court and one of the State's counsel in this prosecution, testified, for the State, that Mack Allen, mentioned in the indictment read in evidence as one of the proprietors of the burglarized house, was the same Mack Allen for whose murder the defendant was being prosecuted; and that the Willie Powell mentioned in the said indictment and judgment was the same person as the defendant. The defense objected that the witness was disqualified upon the ground that, at the beginning of the trial, the State invoked the rule sequestering witnesses, and the witness Pope was not sworn and sequestered with the others, notwithstanding the defense then expressly declined to waive any right they had under the rule.

Jack Wilson, the first witness for the defense, testified that the defendant had been back from the penitentiary for a year or so. He had often seen the defendant in Mack Allen's saloon.

He had often seen Mack Allen and the defendant talking together, and they appeared to him to be on friendly terms. He did not know how the defendant felt towards Mack Allen.

The defendant's mother, Mrs. Maria Powell, was the next witness for the defense. She testified that the defendant was at her house on the night that Allen was shot, until he was taken away by the officers. At about eight o'clock on that night, he went from her house to the cellar in Abe Hollins's saloon, which is but a few steps from the witness's back door. At about nine o'clock the witness heard a disturbance in that cellar and called the defendant, who did not come into her room until about eleven o'clock, from which time he did not go out of the house until he was taken out by the officers, but remained there with his wife, who was sick.

The witness detailed the incidents of the defendant's arrest, between twelve and one o'clock that night, exactly as they were related by Sheriff Perry, except that she made no mention of the discovery of the pistol, and declared that the defendant was in bed, undressed, having on neither pants nor socks at the time.

Cross-examined, this witness stated that the defendant and his wife were creating a disturbance between themselves that night, and she told them that if they did not stop it she would thrash them both. They kept it up until twelve o'clock, when she struck the defendant a few blows with the strap, which brought this conjugal discussion to a satisfactory conclusion. The defendant went to bed at ten o'clock that night, and left only when taken by the officers. He was born the July following the "surrender," and was seventeen years old.

The defendant's wife, Julia Powell, testified in his behalf that she was sick on the night of the shooting, and that the defendant, at about nine o'clock, went for some medicine for her and returned between ten and eleven o'clock; from which time he remained in the house with her until he was arrested. Sheriff Perry, Mr. Long and Mr. Rudd came to the house and arrested the defendant at about one o'clock. They found his pistol under his pillow.

On her cross-examination the witness said that Doctor J. H. Taylor was the physician for whom the defendant went, to attend her on that night. He came, prescribed, and the defendant went off with him, and returned with the medicine, and re-

mained in the house till arrested. The witness said she had bought whisky from Abe Hollins, but never from Mack Allen.

D. Welch testified, for the defense, that he and the deceased were partners at the time of the shooting. He had often seen the deceased and the defendant together, but had never observed any ill feeling between them. He had never sold whisky to the defendant's wife.

L Aubrey, for the defense, had diagramed the vicinity, and testified that by measurement it was about one hundred yards from Allen's house to the point where he was shot; about eight yards from the same spot to the point where the Gregg boys met Powell; and about fifty yards from there to Mack Allen's house. A person could get to the point where the Greggs met the defendant, and have been at the place where Allen was shot.

Mary Powell, the defendant's sister, testified that she was about eight years old when the defendant was born, in the July following the "surrender." She was old enough to remember and did remember that event. The defendant at the time of this trial was seventeen years old.

In rebuttal, the State introduced Jim Thaddeus, who testified that he had known the defendant for seven or eight years, and was of opinion that the defendant was about twenty years old. He knew the defendant in 1872, when, in the opinion of the witness, he was about twelve or thirteen years old. He did not know when the defendant was born.

Henry Marshall, testifying for the State in rebuttal, stated that the defendant was about two years old at the time of the surrender. This statement was not well sustained by his cross-examination, wherein the witness stated that he and the defendant's father belonged to the same master in slavery, and that the defendant was born after slavery was over, while Mr. Witherspoon was doing business in Marshall.

Dan Hawley, in rebuttal, testified that on his return from the army in April, 1864, Maria Powell had a baby about a year old, and though it was possible that that child was one of her other several children, the witness felt quite certain that it was the defendant.

Tobe Wallace, in rebuttal, testified that he had known the defendant for about fourteen years, and was almost positive that he was about twenty-two years old.

Missouri Ford testified, in rebuttal, that she positively knew

that the defendant was born in June, 1864, a year before the surrender.

The defense, in rebuttal, introduced Major Stedman, who testified that Mr. Witherspoon, referred to by the witness Henry Marshall, did not commence business in Marshall till the spring or fall of 1866, after the war.

Doctor Taylor, for the State, testified that the defendant called him to see his wife once at night, but that was previous to the shooting. He did not visit the defendant's wife on that night.

*W. H. Pope*, for the appellant.

*H. Chilton*, Assistant Attorney General, and *A. Pope*, for the State.

WILLSON, J. The State was permitted, over the objections of the defendant, to introduce evidence proving that the defendant, some three years before deceased was shot, had been convicted of the burglary of deceased's house, and that he had served his term in the penitentiary, and returned. This testimony, we think, was admissible for the purpose of establishing a motive for the killing, and a malicious intent. It is somewhat remote, it is true, but still it tends in some degree to show a motive actuating the defendant in shooting the deceased, if in fact he did shoot him, and that such motive was a revengeful and malicious one. Taken in connection with the other facts in the case, we do not think the court erred in admitting this evidence. (*Dill* v. *The State*, 1 Texas Ct. App., 278; *Coward* v. *The State*, 6 Texas Ct. App., 60; *Somerville* v. *The State*, 6 Texas Ct. App., 433; *Rucker* v. *The State*, 7 Texas Ct. App., 549.)

Alexander Pope, a witness for the State, was permitted to testify upon the trial, over the objections of the defendant. The objection made to his testifying was that he had not been sworn and placed under the rule, as had the other witnesses in the case. It appears from the record that Mr. Pope was an attorney of the court, and was one of the counsel representing the State in the prosecution of this case. The enforcement of the rule for sequestering witnesses is a matter largely confided to the discretion of the trial judge, and in the absence of anything showing an abuse of this discretion, his action in the matter will not be revised by this court. In this case no abuse of the discretion

confided to the judge is apparent, or even pretended. (*Walling* v. *The State*, 7 Texas Ct. App., 625.)

The court, in its charge to the jury, instructed the jury upon both degrees of murder. This is objected to by defendant's counsel, and it is urged that the court erred to the prejudice of the defendant in charging upon murder in the second degree, because the evidence did not warrant such charge; that if the evidence showed that the homicide was the act of the defendant, it was murder in the first degree. We think the evidence called for a charge upon both degrees of murder, and that the court acted properly in giving the instructions it did, and the jury by their verdict, finding the defendant guilty of murder in the second degree, conclusively shows the propriety of the charge. (*Edmondson* v. *The State*, 41 Texas, 496; *Holden* v. *The State*, 1 Texas Ct. App., 225; *Gatlin* v. *The State*, 5 Texas Ct. App., 531.)

The court charged upon the defense of *alibi*, stating in the charge that this was the defense relied upon by the defendant. This is objected to because, as counsel says in his brief, it was not true in fact, and because it was a charge upon the weight of evidence. We do not agree with counsel upon this charge. The only defense set up in the case under the plea of not guilty was that of an *alibi*. We can see no impropriety in the statement of this fact in the charge of the judge when he instructed the jury upon this defense. In our judgment it was not a charge upon the weight of evidence, and was not calculated to injure the rights of the defendant.

The sufficiency of the evidence to support the verdict and judgment of conviction is the only remaining question in this case. The evidence proves that on the night of February 15, 1882, the deceased, Mack Allen, was shot, the shot taking effect in his leg near the knee joint; that this occurred in the city of Marshall, Harrison county, Texas. He died on the nineteenth of March, 1882, more than one month after he was wounded. Two physicians who examined his wound, and who attended him until his death, testified that it became necessary, in their judgment, to amputate the wounded limb, and they did amputate it; that some days after the amputation, and a short time before his death, he had two attacks of colic, and was all the time troubled with diarrhœa; that these diseases tended to weaken him; that the day before he died his abdomen swelled up tight, and he complained of intense pain in his bowels. The diarrhœa, followed by the swelling of the bowels, they attributed

to an abscess formed in the bowels. They both state that Allen died from the wound inflicted on his leg, the diarrhœa, the swelling of and pain in the bowels, all combined; but that the wound caused all these things. The question is raised as to the sufficiency of this evidence to establish the *corpus delicti*. It is shown by the proof that the deceased was carefully nursed and attended to from the time he was wounded until he died, and that his physicians resorted to every treatment suggested by their skill and experience, to save his life. The physicians state positively that the wound produced the diseases with which the deceased was affected, and that the wound and the diseases combined produced his death.

It is an ancient and well settled principle of the law of homicide, that, if a wound causes a disease which produces death, the death is imputable to the wound. (Hale's P. C., 428; Whart. Cr. Ev., 382; 2 Whart. Am. Cr. Law, 1064; *Kee* v. *The State*, 28 Ark., 155; *McAlister* v. *The State*, 17 Ala., 439; *Coffman* v. *The Commonwealth*, 10 Bush. Ky., 495.) Mr. Greenleaf lays down the doctrine thus: "If death ensues from a wound given in malice but not in its nature mortal, but which being neglected or mismanaged the party died, this will not excuse the prisoner who gave it; but he will be held guilty of the murder, unless he can make it clearly and certainly appear that the maltreatment of the wound, or the medicine administered to the patient, or his own misconduct, and not the wound itself, was the sole cause of his death; for if the wound had not been given, the party had not died. So, if the deceased were ill of a disease apparently mortal, and his death were hastened by injuries maliciously inflicted by the prisoner, this proof will support an indictment against him for murder; for an offender shall not apportion his own wrong." (1 Greenl. Ev., Sec. 139.) The same rule has been incorporated into our Penal Code in Articles 547 and 551. The opinion of medical experts as to the cause of the death is always admissible when such cause is involved in doubt, and there were no witnesses to the occurrence. (*Shelton* v. *The State*, 34 Texas, 662.)

In this case, we think the *corpus delicti* was sufficiently established by competent evidence, and that the evidence in other respects was amply sufficient to support the conviction.

The charge of the court is comprehensive and correct, and as favorable to the defendant as the facts, and the law applicable to such facts, would warrant. We have discovered no error

demanding a reversal of the judgment, and it is therefore affirmed.

*Affirmed.*

Opinion delivered November 18, 1882.